IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, a non-profit organization, et al., | CV 12–90–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| CHIP WEBER, in his official capacity as Forest Supervisor for the Flathead National Forest, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiffs filed suit on May 29, 2012, seeking judicial review of the U.S. Forest Service's Record of Decision pursuant to the Administrative Procedures Act, 5 U.S.C. § 706 permitting implementation of the Flathead National Forest Precommercial Thinning Project ("Project"). Plaintiffs claim Defendants violate NEPA by approving the Project as a categorical exclusion despite extraordinary circumstances requiring an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS"). Specifically, Plaintiffs allege the Forest Service fails to

1

analyze the Project's impacts to bull trout critical habitat and bull trout; fails to analyze the Wild and Scenic North Fork of the Flathead River under an extraordinary circumstances analysis; and fails to sufficiently analyze impacts on lynx and their critical habitat. Plaintiffs also claim the Forest Service violates the National Environmental Policy Act ("NEPA") by failing to take a hard look at the direct, indirect, and cumulative effects of the Project. Plaintiffs challenge the Project under § 7 of the Environmental Species Act ("ESA") as follows: the Forest Service's determination that the Project has no effect on bull trout is unsupported by the record; Defendants fail to specify where thinning will occur in relation to bull trout critical habitat; and Defendants' finding that the Project may affect but is not likely to adversely affect lynx and lynx critical habitat violates the ESA. Finally, Plaintiffs argue the Forest Service violates the National Forest Management Act ("NFMA") by failing to comply with the Inland Native Fish Strategy ("INFISH").

Defendants respond that the Project complies with NEPA because the Forest Service: sufficiently identified where Project activities would occur; provided appropriate Wild and Scenic River analysis; reasonably determined the Project is not likely to adversely impact lynx or lynx critical habitat; and is not required to consider cumulative impacts because categorical exclusions by definition do not

have cumulative effects on the environment. Regarding the ESA, Defendants argue the biological assessment correctly concludes the Project will not effect bull trout or its habitat and the analysis of bank stability, temperature increases, and peak flows was sufficient. For lynx, Defendants contend the Forest Service did not mischaracterize matrix habitat, the Lynx Direction does not apply, and the Forest Service was not required to reinitiate consultation on the Forest Plan. Defendants lastly argue the Project complies with INFISH and thus the Project does not violate NFMA.

This Project is the most innocuous logging project to be challenged in this Court to date. The Project was dramatically reduced in scope following public comment, primarily by the Plaintiffs, from 12,563 acres to approximately 3,650 acres. Only 500 acres will be thinned per year. No roads will be reopened or created for Project use. Only hand trimming will be performed, with hand tools used near bull trout critical habitat. The trees that will be thinned fall far short of commercial size–most are one to five inches in diameter and only a few feet tall. In short, this Project, compared to the majority of projects that come before the Court, is truly designed to promote and restore forest health, and will benefit the endangered species inhabiting the Flathead National Forest. Plaintiffs' complaints are solely based on relatively insignificant alleged procedural missteps by the

Forest Service, and they point to no actual or even reasonably potential harm the Project will cause to any of the relevant species. For these reasons, as well as the legal analysis to follow, Plaintiffs' motion for summary judgment will be denied and Defendants' motion will be granted.

The Forest Service declares the purpose of the Project is to "promote stand health and vigor, restore western white pine stands by promoting genetically improved planted white pine, and to reduce future wildland fire risk and hazard by reducing hazardous fuels within the wild urban interface." (Doc. 20 at 2-3.) Defendants state that thinning results in an increase in the amount of moisture, sunlight, and nutrients received by the remaining trees in stands, and thus promotes disturbance-resistant species of trees. "Stands proposed to be thinned fall into two stand types: (1) post-fire second-growth stands in the wildland-urban interface that are dominated by three to- four-foot tall lodgepole pine trees at a density of approximately 10,000 to 100,000 stems per acre; and (2) 10 to 30-year old second growth stands dominated by mixed conifer trees growing at a density of approximately 1,000 to 5,000 stems per acre." FS 0772. The Project will retain hardwood trees when feasible and no treatments are planned in stands with mature or old trees. *Id.* The stands proposed for thinning do not contain trees of

commercial size and the Project will not produce merchantable wood products. FS 0010. The thinning units vary between one and 181 acres in size and most units are less than 50 acres. FS 0011-13. Thinning is planned to occur at a rate of around 500 acres per year, and the Project began in July 2013 with thinning of slightly over 400 acres.

In November 2010, the Forest Service completed a biological assessment on bull trout which concluded the Project would have no effect on bull trout. FS 0226. In December 2010, the Forest Service completed a biological assessment for Terrestrial Wildlife Species concluding that the Project "may affect but is not likely to affect" grizzly bears, Canada lynx, or Canada lynx critical habitat. The Forest Service informally consulted with the Fish and Wildlife Service for the grizzly bear, bull trout, lynx, lynx critical habitat, and the then-listed gray wolf. The Fish and Wildlife Service agreed with the Forest Service's determinations and conclusions in the biological assessment that Project-related impacts to gray wolves, grizzly bears, Canada lynx, and designated critical habitat for Canada lynx would be insignificant. After receiving public comment, the scope of the Project was reduced from 12,563 acres to approximately 3,650 acres.

The Decision Memorandum determined the project was categorically excluded from analysis in an EA or an EIS pursuant to 36 CFR 220.6(e)(6) –

"Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." Plaintiffs timely appealed the Decision Memo, and Deputy Regional Forrester Thomas Schmidt denied the appeals on January 4, 2012. Plaintiffs filed a motion for preliminary injunction on June 22, 2013, which was denied July 31, 2013.

## ANALYSIS

### I.   NEPA

NEPA requires federal agencies to prepare a detailed environmental impact statement for actions that may significantly affect the environment. 42 U.S.C. § 4332(2)(C). Unlike NFMA, NEPA does not compel agencies to achieve particular environmental results. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Agencies instead must abide by NEPA's procedural requirements to "carefully consider" a project's environment impacts and make the relevant information available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

Under NEPA, the Court must "simply [ ] ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008) ("*Lands Council I*"), *overruled in part on other grounds by Winter v. Nat. Resource Def. Council, Inc.*, 555 U.S. 7 (2008). A decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 987 (citations and internal quotation marks omitted).

### A. Categorical exclusion

A federal agency may adopt a "categorical exclusion" for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. An action falling within an adopted categorical exclusion generally does not mandate preparation of an EIS or an EA. *Id.* However, an agency adopting a categorical exclusion must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* If such extraordinary circumstances exist, an EIS or an EA must be prepared.

Resource conditions that agencies should consider in determining whether extraordinary circumstances warrant further analysis and documentation in an EA or an EIS include, as relevant here: federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or Forest Service sensitive species; and Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas. 36 C.F.R. § 220.6(b)(1). The mere presence of one of these conditions does not prohibit use of a categorical exclusion. § 220.6(b)(2). Rather, if a cause-effect relationship exists between the proposed action and the potential effect on the condition, the agency must analyze the degree of the potential effect to determine whether extraordinary circumstances exist. *Id.*

Defendants determined the Project was categorically excluded from analysis in an EA or EIS pursuant to 36 C.F.R. 220.6(e)(6) which excludes "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." An example of this type of categorical exclusion is "thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand." 36 C.F.R. 220.6(e)(6)(ii). The subject Project falls within this example.

Plaintiffs argue extraordinary circumstances are present in this case precluding the use of a categorical exclusion and requiring an EA or EIS. They contend that the Forest Service's failure to analyze whether the Project will impact bull trout critical habitat is arbitrary and capricious. Defendants argue they reasonably determined no extraordinary circumstances exist, and focus their arguments regarding categorical exclusion to the issue of whether their cumulative impacts analysis was appropriate.

"An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for Environment v. United States Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999). Prior to establishing a categorical exclusion, the agency is required to perform a scoping process to identify the significant issues related to the proposed action and judge the scope of the issues. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007). During this process, the Forest Service must consider the cumulative impacts of connected, cumulative, and similar actions, and must prepare an EA if the project may have significant effects on the environment. *Id.* at 1027.

Here the Forest Service decided the Project properly fell within the categorical exclusion for "timber stand and/or wildlife habitat improvement

activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction" pursuant to 36 C.F.R. § 220.6(e)(6).  One of the examples of this type of exclusion is "thinning to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand." 36 C.F.R. 220.6(e)(6)(ii).  Plaintiffs do not challenge Defendants' decision on this point–because, again, the Project is a mirror image of the example listed at § 220.6(e)(6)(ii).  Rather, Plaintiffs contend Defendants' analysis of extraordinary circumstances is flawed because the Forest Service failed to sufficiently analyze the cause and effect relationship between the Project and its effects on bull trout. (Doc. 19 at 24.)  Defendants' analysis of bull trout and its critical habitat was not arbitrary or capricious, and Defendants did not err by determining the Project falls within a categorical exclusion for the reasons stated below.

### 1. Bull trout critical habitat

### a. Inadequate maps

Plaintiffs argue that the agencies have not identified where project activities will occur in relation to bull trout critical habitat.  As a result, Plaintiffs contend, the agencies' analysis of how the Project will affect bull trout critical habitat is flawed.  The Forest Service has adequately identified where the precommercial thinning will take place in relation to critical bull trout habitat and Plaintiffs' claim

fails on this issue.

In its Bull Trout Biological Assessment, the Fish and Wildlife Service describes the location of critical habitat for "3 different bull trout core populations." FS 219. It also describes the major tributaries of these rivers, lakes that have bull trout populations, and areas that support bull trout spawning. *Id.* Also part of the record are eight maps showing the boundaries of the proposed precommercial thinning. (*See* Doc. 14-1.)[1]

In light of this record, the Forest Service argues that Plaintiffs have not explained how a more detailed map would impact the analysis of effects on bull trout or bull trout critical habitat. The Forest Service is correct on this point. The maps are sufficiently detailed to allow Plaintiffs to identify where the precommercial thinning will take place. They identify the project boundaries down to the township and range level. (Doc. 14-1). The maps allow the Plaintiffs to identify where those activities will take place in relation to bull trout critical habitat.

Plaintiffs' main concern with respect to the maps appears to be that the

---

[1] The parties refer to this document as either "AR:R1-R9" or "FS:R1-R8," but the supplemental record does not reflect this numbering nor does any other filing show that numbering. Nevertheless, the maps at Doc. 14-1 are the only possible maps to which the parties could be referring.

maps do not identify specifically where thinning will take place within the 50-foot stream buffer. But, as the Forest Service explains, this identification is not necessary because special steps (on-site analysis by a fisheries biologist) will be taken within the buffer area to ensure that any thinning (which will be done by hand) will not have any effects on bull trout or their critical habitat. FS 223–25. The Forest Service has adequately identified where the precommercial thinning will take place in relation to critical bull trout habitat.

### b. PCEs

Plaintiffs next argue that the agencies' bull trout analysis is inadequate because the Service did not consider the Project's potential effects on critical habitat in terms of the nine primary constituent elements (PCEs) for critical habitat. (Doc. 28 at 19–23.) Plaintiffs did not raise this argument until their reply brief. Generally, "legal issues raised for the first time in reply briefs are waived." *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990). However, because Defendants had the opportunity to reply to Plaintiffs' argument, the Court will consider it. Defendants respond that PCE analysis was not required, and the Bull Trout Biological Assessment sufficiently analyzed the impact of the Project because the stream characteristics examined overlap with the PCEs and the bull trout critical habitat rule.

The PCEs for critical habitat are the "physical or biological features" that are "essential to the conservation of the species" and "which may require special management considerations or protection." 15 U.S.C. § 1532(5)(A)(i); 50 C.F.R § 424.12(b). Section 424.12(b) outlines the criteria for designating critical habitat.

There are nine PCEs for bull trout critical habitat:

(1) Springs, seeps, groundwater sources, and subsurface water connectivity (hyporheic flows) to contribute to water quality and quantity and provide thermal refugia.

(2) Migration habitats with minimal physical, biological, or water quality impediments between spawning, rearing, overwintering, and freshwater and marine foraging habitats, including but not limited to permanent, partial, intermittent, or seasonal barriers.

(3) An abundant food base, including terrestrial organisms of riparian origin, aquatic macroinvertebrates, and forage fish.

(4) Complex river, stream, lake, reservoir, and marine shoreline aquatic environments, and processes that establish and maintain these aquatic environments, with features such as large wood, side channels, pools, undercut banks and unembedded substrates, to provide a variety of depths, gradients, velocities, and structure.

(5) Water temperatures ranging from 2 to 15 °C (36 to 59 °F), with adequate thermal refugia available for temperatures that exceed the upper end of this range. Specific temperatures within this range will depend on bull trout life-history stage and form; geography; elevation; diurnal and seasonal variation; shading, such as that provided by riparian habitat; streamflow; and local groundwater influence.

(6) In spawning and rearing areas, substrate of sufficient amount, size, and composition to ensure success of egg and embryo overwinter

survival, fry emergence, and young-of-the-year and juvenile survival. A minimal amount of fine sediment, generally ranging in size from silt to coarse sand, embedded in larger substrates, is characteristic of these conditions. The size and amounts of fine sediment suitable to bull trout will likely vary from system to system.

(7) A natural hydrograph, including peak, high, low, and base flows within historic and seasonal ranges or, if flows are controlled, minimal flow departure from a natural hydrograph.

(8) Sufficient water quality and quantity such that normal reproduction, growth, and survival are not inhibited.

(9) Sufficiently low levels of occurrence of nonnnative predatory (e.g., lake trout, walleye, northern pike, smallmouth bass); interbreeding (e.g., brook trout); or competing (e.g., brown trout) species that, if present, are adequately temporally and spatially isolated from bull trout.

(Bull Trout Rule, FS 396–97.)

Here, the Fish and Wildlife Service completed a biological assessment for bull trout in advance of the Project that identified three potential effects that the Project might have on bull trout: "bank stability, temperature alterations, and water yield." (Bull Trout Biological Assessment, FS 224–26.)  Each of these three effects is related to one or more of the nine PCEs.  Further, the Project follows the INFISH direction which examines pool frequency, large woody debris, mean-maximum water temperature, mean wetted width to depth ratio, and bank stability. Ultimately, the Service concluded that thinning activities would not affect critical habitat in any of the three ways, as long as the thinning occurred outside a 50 foot

stream buffer.

The Court agrees with Defendants that analysis of the PCEs in this case was not required. The Bull Trout Biological Assessment relied upon by Defendants in this case is very thorough and covers all the substantive areas outlined in the PCEs relevant here. The PCEs that are not covered in the Bull Trout Biological Assessment analysis do not appear to apply to this Project. Thus, even if the Court were to require Defendants to analyze the bull trout PCEs for the Project, in all likelihood the analysis would probably look almost identical to the current analysis, perhaps with slightly different language. Moreover, the effects that the Fish and Wildlife Service identified here are very similar to the likely effects of timber harvesting identified in the Bull Trout Rule: stream shading and cover, channel stability, large woody debris recruitment, increase sedimentation, and stream flows. (Bull Trout Rule, FS 399.)

In sum, the PCEs are one of many analytical tools Defendants may use in determining whether, and to what extent, a Project may affect endangered species. NEPA does not require Defendants to analyze the bull trout PCEs in this case, and Defendants did not err in failing to do so. *See* 42 U.S.C. § 4331 *et seq*. Defendants' analysis was thorough and complete without specifically addressing each PCE, and their conclusion that the Project will have no effect on bull trout or

bull trout critical habitat was correct.

## 2. Impacts on Wild and Scenic North Fork of the Flathead River

Plaintiffs argue Defendants erred by failing to analyze the congressionally designated Wild and Scenic North Fork of the Flathead River ("North Fork") in its analysis of extraordinary circumstances. Although the Forest Service did analyze the Project impacts on the North Fork in its Wild and Scenic River Act analysis, Plaintiffs contend Defendants still violated NEPA because they did not do the analysis under the extraordinary circumstances section of the decision memorandum. Defendants respond that Plaintiffs are "fly-specking" the decision memorandum by complaining that their correct analysis was simply contained within the wrong section. Defendants are correct.

Defendants' river analysis provides the requisite findings necessary for an extraordinary circumstances analysis and the decision memo confirms that the Project does not violate the Wild and Scenic Rivers Act or NEPA. The river analysis states that the thinning in both the scenic and recreation segments of the North Fork "would open up the stand, likely making it more pleasing to the eye" and will "allow the trees to grow more vigorously, thus allowing a forest condition

to mature more rapidly." FS 7849-50. Many of the units within these segments

have been burned by wildfire and have previously been logged. *Id.* Many of the

proposed treatment areas will be unseen by river users. Overall, the analysis

concluded that "the changes in this area should be very minimal to river users."

*Id.*

The Forest Service's decision not to prepare an EIS must be upheld unless

the decision was unreasonable. *Friends of the Southeast's Future v. Morrison*,

153 F.3d 1059, 1062 (9th Cir. 1998). In reviewing an EIS, the Court may not "fly-

speck the document and hold it insufficient on the basis of inconsequential,

technical deficiencies." *Id.* at 1063. Although this statement refers to review of

an EIS, the Court sees no reason why the same principle should not apply to

review of a decision memo where no EIS was prepared. The decision memo states

that no thinning will occur within any segments designated as wild, and that all

thinning meets the Forest Plan standards for the river segments. The river analysis

provides sufficient analysis regarding whether extraordinary circumstances are

present because the North Fork is a congressionally designated Wild and Scenic

River to satisfy 36 C.F.R. § 220.6(b). As the statute points out, the mere presence

of one of these conditions does not prohibit use of a categorical exclusion. §

220.6(b)(2). Rather, the agency is only required to analyze the degree of the

potential effect of the Project on the resource condition to determine whether

extraordinary circumstances exist. *Id.* The river analysis provides this scrutiny

and hence no NEPA violation occurred here.

### 3. Lynx

Plaintiffs argue the Forest Service fails to sufficiently analyze the impacts to

lynx and lynx critical habitat in the Biological Assessment for Terrestrial Wildlife.

Thus, Plaintiffs contend Defendants' analysis of extraordinary circumstances is

flawed and an EA or EIS must be prepared to remedy Defendants' NEPA

violations. These claims are directly linked to Plaintiffs' ESA claims regarding

lynx, and, for the reasons stated in that section, the Court does not find Plaintiffs'

arguments persuasive. Defendants reasonably concluded no extraordinary

circumstances exist regarding lynx for this Project.

### B. Cumulative effects

Plaintiffs next fault the Forest Service for failing to sufficiently analyze the

cumulative effects of the Project. Plaintiffs argue NEPA requires the Forest

Service to take a "hard look" at the direct, indirect, and cumulative effects of the

Project on lynx, bull trout, grizzly bears and each species' critical habitat.

Defendants respond that analysis of cumulative impacts does not apply to

categorical exclusions. Even if the agencies were required to do a cumulative

impacts analysis, they contend they satisfied that requirement through the cumulative effects worksheets prepared in conjunction with the Project, as well as other key documents demonstrating their consideration of ongoing projects. Defendants assert that if the Court finds extraordinary circumstances do not exist, the analysis on this issue ends.

Defendants are correct on this issue because extraordinary circumstances analysis includes consideration of whether a normally excluded action may have cumulatively significant environmental effect. 40 C.F.R. § 1508.4. The term significantly as used in NEPA mandates a multitude of considerations, including the potential for uncertain effects, which is also a consideration under the extraordinary circumstances analysis. 40 C.F.R. § 1508.27. Because a cumulative effects analysis was performed as part of the categorical exclusion decision for this Project, a separate cumulative impacts analysis is not required.

II.    ESA

Section 7 of the ESA requires an agency to ensure that no discretionary action will "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a). "Only after the [agency] complies with § 7(a)(2) can any activity that may affect the

protected [species] go forward." *P. Rivers Council v. Thomas*, 30 F.3d 1050, 1055–57 (9th Cir. 1994).

The Forest Service's first step in complying with § 7 is to obtain from the Wildlife Service "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (emphasis added). If the Wildlife Service advises that a listed species or critical habitat may be present, the Forest Service must complete a biological assessment to determine if the proposed action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12 (f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Once the biological assessment is completed, it must be shared with the Wildlife Service. 50 C.F.R. § 402.12(j). "If [the Wildlife Service] advises that no listed species or critical habitat may be present, the Federal agency need not prepare a biological assessment and further consultation is not required." 50 C.F.R. § 402.12(d).

A determination by the Forest Service in a biological assessment that an action "may affect" a listed species or critical habitat gives rise to a consultation requirement under section 7 of the ESA. *Karuk Tribe of Cal. v. United States Forest Service*, 681 F.3d 1006, 1027 (9th Cir. 2012). The Ninth Circuit holds that

"the minimum threshold for an agency action to trigger consultation with the Wildlife Service is low." *W. Watersheds Project*, 632 F.3d at 496. "[A]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Id.* (citing 51 Fed. Reg. 19,949; *Cal. ex rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1018–19 (9th Cir. 2009)).

There are two forms of consultation: formal and informal. *Karuk Tribe of Cal.*, 681 F.3d at 1027. Formal consultation is necessary where the Forest Service has determined that an action is "likely to adversely affect" a listed species. But it is not required if 1) the Forest Service finds, either in its biological assessment or through informal consultation, that while a project "may affect" a listed species, the species is "not likely to be adversely affected" and 2) the Wildlife Service concurs in writing. 50 C.F.R. §§ 402.12(j)–(k), 402.14(b)(1), 402.13(a).

The Administrative Procedure Act governs review of agencies' actions under Section 7. *W. Watersheds Project,* 632 F.3d at 496 (citation omitted). The Court must determine whether the agencies' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citation omitted). "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving scientific matters."

*United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989).

However, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

The Fish and Wildlife Service promulgated the final bull trout critical habitat rule which designated approximately 19,729 miles of streams, 488,251.7 acres of reservoirs and lakes, and 754 miles of marine shoreline as critical habitat for bull trout throughout the Northwest. (Doc. 21 at 18.) The rule went into effect November 17, 2010, and Defendants completed the Bull Trout Biological Assessment on November 18, 2010. The decision memo states that "all precommercial thinning activities will be no closer than 50 linear feet to all waterways, including scoured channels. A 50 foot aquatic buffer will result in no measurable peak flow increases and allow for a 'No Effect' to bull trout . . . determination." (Doc. 21 at 20.) Hand-thinning may be permitted to the channel edge on a case-by-case basis if permitted by a fisheries biologist. The Forest Service determined the Project would have "no effect" on bull trout.

A.     **Bull trout and Bull Trout Critical Habitat**

Plaintiffs argue Defendants violate § 7 of the ESA by failing to make a specific finding on whether the Project may result in the destruction or adverse

modification of bull trout critical habitat. Plaintiffs point out that neither the bull trout biological assessment nor the decision memo discuss bull trout critical habitat–rather Defendants discuss bull trout habitat generally in their analysis of peak flow, bank stability, and stream temperature. The bull trout critical habitat rule lists the nine bull trout PCEs, and Plaintiffs argue, similar to their NEPA argument, that Defendants violate the ESA by failing to describe the Project impacts to the PCEs.

Defendants respond that the Forest Service's "no effect" determination was rational and that the Forest Service was not required to consider the PCEs for bull trout critical habitat because that analysis only applies to critical habitat designation–not § 7 consultation. Defendants argue that while they may elect to consider PCEs during consultation, the ESA does not require it and it would serve no purpose here where there is no effect on the species from the proposed action. Further, Defendants aver, the bull trout critical habitat rule emphasizes consideration of PCEs only in conjunction with the adverse modification inquiry used for preparation of biological opinions.

Defendants are correct that no regulation or statute requires the agencies to consider the PCEs during § 7 consultation; rather, the agencies may consider them and often do when determining the extent of a proposed action's effects.

However, Defendants assert that the FWS does not address PCEs in making a "no effect" determination. The regulation governing biological assessments—50 C.F.R. § 402.12—does not prescribe analysis of PCEs in this context. The FWS does require consideration of PCEs during the "adverse modification" portion of formal consultation by memorandum. However, Plaintiffs point to no authority that indicates that the Service must consider PCEs when it analyzes effects on critical habitat in a biological assessment. Where there is a "no effect" determination, as in this case, the agencies have concluded that the Project is unrelated to a species' habitat PCEs. Requiring a PCE analysis in the context of a no effects analysis, when no statute or regulation mandates it, is contrary to the purpose and intent of "no effect" determinations, and the Court will not require it here. Defendants' decision is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and the Court will defer, as it must, to the agencies' technical expertise regarding the proper considerations for § 7 consultation.

## C. Canada lynx

### 1. "Matrix" habitat characterization

Plaintiffs contend the Forest Service's conclusion that the Project "may affect but is not likely to affect" lynx and lynx critical habitat is arbitrary and not

supported by the record. Plaintiffs challenge Defendants' characterization of habitat as matrix habitat. Defendants respond that their designation of matrix habitat is correct and many of Plaintiffs' arguments are based on records prepared before the Forest Service eliminated significant portions of the stands from the Project to avoid impacting potential lynx habitat. Defendants' designation of matrix habitat is not arbitrary and Plaintiffs' arguments fail on this issue.

Plaintiffs initially argued that Project units that lacked adequate snow conditions could still qualify as lynx critical habitat because lynx could possibly forage and den in those areas in the summer. This argument is not supported by the critical habitat designation which requires winter snow conditions that are generally deep and fluffy for extended periods of time. FS 7930. Squires *et al.* (2010) also does not support Plaintiffs' argument because it states that lynx use the same mid-to-high elevation forest areas in the summer as winter, except summer habitat is at slightly higher elevations. (Doc. 19-7 at 7-8.) Thus, Plaintiffs' contention that low elevation Project units that lack deep fluffy snow in winter could support lynx habitat in the summer fails.

Plaintiffs' contention that the Forest Service arbitrarily determined that all Project units below 4,000 feet were not lynx habitat is contradicted by the record. As part of the Flathead's mapping of lynx habitat, the Forest Service considered

forest features, elevations, habitat types, and information from weather reporting

stations and National Resource Conservation Service snow course data because

snow was a defining variable. The Forest Service states that the habitat elevation

level was based on this data, and was not set at 4,000 feet across the forest. "In

some areas adequate snow depths were predicted to occur down to 3,400 feet in

elevation, where in other locations the correct snow conditions only occur down to

4,100 feet in elevation." FS 8010. To be considered lynx habitat, the Forest

Service looked at two criteria–boreal forest and snow depth. *Id.* Areas meeting

only one criteria within lynx critical habitat were considered matrix habitat. The

critical habitat designation states that

> [i]n matrix habitat, activities that change vegetation structure or condition
> would not be considered an adverse effect to lynx critical habitat unless
> those activities would create a barrier or impede lynx movement between
> patches of foraging habitat and between foraging and denning habitat within
> a potential home range, or if they would adversely affect adjacent foraging
> habitat or denning habitat. For example, <u>a pre-commercial thinning or fuels
> reduction project in matrix habitat would not adversely affect lynx critical
> habitat, and would not require consultation.</u>

*Id.* (emphasis added).

The critical habitat designation provides as an example for a project

occurring in matrix habitat that would not adversely affect lynx critical habitat

exactly that challenged here: a pre-commercial thinning project. This strongly

supports Defendants' decision that the Project is not likely to adversely affect lynx or lynx critical habitat and the decisions regarding matrix habitat. Further, the data sheets upon which Plaintiffs rely to support their elevation arguments do not accurately identify Defendants' conclusions because the Forest Service eliminated large portions of the stands after the sheets were prepared. FS 1002. The Project units do not fall within the Flathead's lynx habitat mapping areas. Although the Flathead's mapping of critical habitat does not entirely overlap with the Fish and Wildlife Service's designation of critical habitat, Fish and Wildlife Service's designation was mapped on a much larger scale and thus did not account for detailed variations within the larger boreal forest as did the Forest Service's mapping. For all of these reasons, Plaintiffs' arguments are not persuasive regarding the matrix habitat designation.

## 2. Standards VEG S1, S2, S5, and S6 do not apply

Plaintiffs next challenge Defendants' failure to determine whether the standards VEGS1, S2, and S5 of the Northern Rockies Lynx Management Direction ("Lynx Direction") apply. Defendants respond that the Lynx Direction standards do not apply because the Project is not located within lynx habitat. The Lynx Direction "applies to mapped lynx habitat on National Forest System land presently occupied by Canada lynx, as defined by the Amended Lynx

27

Conservation Agreement between the Forest Service and the FWS." FS 7664. Because Plaintiffs have not demonstrated that Defendants' conclusion that no Project units are located in lynx denning or foraging habitat is erroneous, this argument fails.

### 3.    Reliance on the Lynx Direction

Plaintiffs argue Defendants erred by relying on the Lynx Direction to decide the Project will not adversely affect or modify lynx critical habitat because the Lynx Direction never addressed whether implementation of its terms would adversely modify lynx critical habitat on National Forests. Defendants respond that the Lynx Direction standards do not apply here because the Project is not located in lynx habitat, but rather in matrix habitat. Defendants also argue that they conducted an independent, project-specific ESA Section 7 consultation as demonstrated by the biological assessment's analysis based on the lynx critical habitat designation.

Defendants are correct. Because the Project is not located in lynx denning or foraging habitat, and because thinning activities in matrix habitat would not create a barrier or impede lynx movement between patches of foraging or denning habitat within a potential home range (FS 0995), the standards from the Lynx Direction do not need to be analyzed to comply with the ESA.

28

**D.    Reinitiation of formal consultation after designation of lynx critical habitat**

Plaintiffs next contend Defendants must reinitiate formal consultation on the Flathead National Forest Plan to determine whether the Lynx Direction will adversely affect the lynx critical habitat now designated on the Flathead. The Fish and Wildlife Service issued the revised critical habitat designation for lynx in 2009 after the Forest Service adopted the Lynx Direction for the Flathead Forest Plan in 2007. Defendants argue reinitiation of formal consultation is not necessary because the Forest Service's adoption of the Lynx Direction did not authorize, fund, or carry out any activity with effects on lynx; hence, there was no affirmative agency action. Defendants contend *Pacific Rivers*, cited by Plaintiffs, does not control because subsequent case law establishes that a land use plan does not constitute ongoing agency action. Defendants further argue that regardless of the duty to reinitiate consultation, potential effects to lynx and their critical habitat will be analyzed under § 7, as Defendants did here using the lynx critical habitat designation.

This Court established a burden-shifting approach for injunctions sought pursuant to alleged ESA violations in *Alliance for the Wild Rockies v. Krueger*, 2013 WL 3187275 (June 25, 2013)("*Bozeman*"). As a first step in the burden

shifting approach, a plaintiff must substantiate its claim by alleging a specific irreparable harm resulting from the ESA violation. *Salix v. United States Forest Service*, 2013 WL 2099811 at *17. In *Burlington Northern*, 23 F.3d at 1511, the Ninth Circuit implied that "harm" in the ESA context is a violation of the ESA—that is, causing "jeopard[y] [to] the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] . . . ." 16 U.S.C. § 1536(a)(2). So, at the outset, the plaintiff must allege that, as a result of the ESA violation, a project will jeopardize the continued existence of a specific endangered species or will destroy or adversely modify its critical habitat.

If the plaintiff alleges a specific harm, then the court presumes the harm is irreparable for purposes of issuing an injunction. *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) (citation and internal quotation marks omitted). At this stage, "'[i]t is not the responsibility of the plaintiff to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed.'" *Wash. Toxics*, 413 F.3d at 1035 (quoting *Thomas*, 753 F.2d at 765).

If the plaintiff has alleged a specific harm, then, at the second step, the burden shifts to the agency which must show that the action will not jeopardize the

species or destroy or adversely modify its critical habitat. *Id.* In terms of critical habitat, the agency must show that the affected critical habitat will remain "functional." That is, the physical and biological features of critical habitat—which are commonly described in terms of primary constituent elements, *see* 50 C.F.R. § 424.12(b)—will not be altered to an extent that appreciably reduces the conservation value of the critical habitat, and neither the recovery nor the survival of the species will be jeopardized. *Gifford Pinchot*, 378 F.3d at 1069–71 (discussing 50 C.F.R. § 402.02); *Natl. Marine Fisheries Serv.*, 524 F.3d at 931–33; 74 Fed. Reg. 8616-01, 8644 (Feb. 25, 2009).

The agencies cannot meet this burden by relying solely on their compliance with standards or guidelines that are the product of the underlying ESA violation. To permit such reliance would violate NEPA because the agencies would be "'fail[ing] to consider an important aspect of the problem.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (quoting *Motor Vehicle Mfrs. Assn., Inc. v. St. Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

If the agency comes forward with evidence that the project will not jeopardize a species or destroy or adversely modify its critical habitat, then, consistent with *Burlington Northern* and *National Marine Fisheries Service*, the plaintiff must come forward with its own evidence of irreparable harm. If the

plaintiff makes this showing, then an injunction is issued.  This approach does not require the Court to balance the equitable interests of the parties (which is prohibited in the ESA context), but it does require the Court to balance the evidence of harm presented by the plaintiff and the agency.  If this balancing is a close question, then the Court errs on the side of protection and issues an injunction.  *Natl. Wildlife Fedn.*, 23 F.3d at 1510–11.

In *Southwest Center for Biological Diversity v. U.S. Forest Service*, the Ninth Circuit held that when there is a procedural violation of the ESA, there is a presumption of irreparable harm that generally requires an injunction.  307 F.3d 964, 972–73 (9th Cir. 2002), *opinion withdrawn*, 355 F.3d 1203 (2004).  But there is a "narrow exception": a project need not be enjoined if it will not harm the species or its critical habitat.  *Id.* at 973.  Although *Southwest Center for Biological Diversity* is not binding precedent, as the Court explained in *Bozeman*, it does serve as guidance in this case, and together with the case law discussed above, supports the burden shifting approach for determining whether a project specific injunction should be issued to remedy a procedural ESA violation.  In summary, the burden shifting approach consists of three steps:

1.     A plaintiff must initially allege a specific irreparable harm resulting from the ESA violation so that the Court can tailor an injunction to remedy the specific harm. If the plaintiff does so,

then the Court presumes that the challenged action will cause irreparable harm.

2.      The agency can rebut this presumption by showing that the challenged action will not jeopardize the species or destroy or adversely modify its critical habitat.

3.      If the agency comes forward with evidence that the challenged action will not jeopardize the species or destroy or adversely modify its critical habitat, then an injunction should be issued only if the plaintiff produces evidence that such harm is at least likely. If the evidence from both sides presents a close question, then the court should err on the side of issuing an injunction.

Plaintiff sought a preliminary injunction to halt the Project in July 2013, and the parties were able to address the burden-shifting analysis in those briefs but not in the summary judgment briefs because the Court's *Bozeman* opinion was not issued until after the summary judgment briefing concluded.  The Court will therefore incorporate the portion of the preliminary injunction briefs discussing lynx critical habitat and the burden-shifting analysis in order to have the parties' full analysis before it.[2]  The Court will also consider Plaintiffs' notice of supplemental authority (Doc. 33) and Defendants' response (Doc. 37), although those briefs also were filed prior to *Bozeman* and thus do not address the

---

[2]District courts may consider uncited record materials and conduct an independent search of the record in deciding summary judgment motions. *See Lynn ex rel Lynn v. Yamaha Golf-Car Co.*, 894 F.Supp.2d 606, 623 (W.D. Pa. 2012) *citing* Fed. R. Civ. P. 56(c)(3).

applicable burden-shifting analysis.

Plaintiffs do not make any specific allegations of irreparable harm that will occur to lynx or lynx critical habitat absent injunction and reinitiation of consultation in their summary judgment briefs. Rather, Plaintiffs focus almost entirely on Defendants' alleged procedural violations without discussing what effects these violations will have on lynx. In their motion for preliminary injunction, Plaintiffs allege Defendants' thinning will reduce lynx habitat quality for up to several decades and may cause habitat fragmentation. Defendants respond that Plaintiffs' vague and conclusory allegations do not meet their requirement at step one to allege a specific irreparable harm resulting from the ESA violation.

First, Plaintiffs must allege that, as a result of the ESA violation, the Project activities will jeopardize the continued existence of a specific endangered or threatened species or will destroy or adversely modify its critical habitat. Plaintiffs' allegations in their preliminary injunction argument that the Project activities will reduce lynx habitat quality and cause habitat fragmentation are enough to satisfy their burden at the first step of the analysis. Though somewhat conclusory, the allegations suffice for the Court to presume that irreparable harm will occur.

Next, Defendants can rebut this presumption by showing that the challenged action will not jeopardize the species or destroy or adversely modify its critical habitat. Adverse modification does not occur in a thinning project that is not commercial in nature; where no trees are being removed from the site or sold; no heavy equipment is required to fell the trees, which are being cut down by hand; and no roads are being constructed or reconditioned. *See Native Ecosystems Council & Alliance for the Wild Rockies v. United States Forest Serv.*, 2011 WL 4015662, at *10 (D. Idaho 2011). In terms of critical habitat, the agency must show that the affected critical habitat will remain functional and the PCEs will not be altered to an extent that appreciably reduces the conservation value of the critical habitat, and neither the recovery nor the survival of the species will be jeopardized. *Bozeman*, 2013 WL 3187275 at *4; *see also* 50 C.F.R. § 402.02 (definition of destruction or adverse modification).

The final rule for lynx critical habitat states that the primary constituent element for lynx critical habitat is:

1. Boreal forest landscapes supporting a mosaic of differing successional forest stages and containing:

> a. Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer

boughs touching the snow surface;

b. Winter snow conditions that are generally deep and fluffy for extended periods of time;

c. Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and

d. Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range.

74 Fed.Reg. at 8638.

Defendants meet their burden at step two through their analysis of the critical habitat designation factors that show the matrix habitat that will be affected by the Project will remain functional. The record also demonstrates that Project activities will not create a barrier or impede lynx movement between foraging and denning habitat within a potential home range. FS 0777. Unlike in *Bozeman*, where the project was likely to adversely affect lynx critical habitat, here the agencies found through careful analysis that the Project is not likely to adversely affect lynx critical habitat. *Bozeman*, 2013 WL at *7. The Forest Service admitted in *Bozeman* that the project would render hundreds of acres of lynx habitat unsuitable, including negatively impacting denning, foraging, and snowshoe hare habitat. Here, no Project activities will take place in denning or

foraging habitat. Regarding matrix habitat, the critical habitat designation lists a precommercial thinning project as a type of action that would not adversely affect lynx critical habitat and would not require formal consultation. FS 0777; FS 0198. The Fish and Wildlife Service concurred with the Forest Service's finding that the Project is not likely to adversely affect lynx critical habitat and that formal consultation was not required. FS 0198. These facts show the Project will not adversely modify lynx critical habitat.

Further, Defendants used the lynx critical habitat designation as the basis of their analysis rather than the Lynx Direction, so independent justification exists apart from the Lynx Direction in this case unlike in *Bozeman*. FS 0781. Similar to *Native Ecosystems Council*, 2011 WL 4015662, this Project is not commercial in nature, no heavy equipment is required to fell the trees, which are being cut down by hand, and no roads are being constructed or reconditioned. The Forest Service independently complied with Section 7 of the ESA to ascertain that the Project will not adversely modify or destroy lynx critical habitat. Having made this determination, the Court now turns back to Plaintiffs at step three to determine whether they have demonstrated that irreparable harm is likely.

Plaintiffs do not meet this burden. The thinning involved in the Project is not likely to adversely affect lynx critical habitat in matrix habitat, which is the

only aspect of the PCE challenged by Plaintiffs. The Project units were selected to occur outside of lynx foraging and denning habitat. The biological assessment states that "proposed thinning is NOT in lynx habitat, so standards VEGS1, S2, S5, and S6 are not affected by the project and exceptions or exemptions to the lynx standards are not needed." FS 0781. Because Plaintiffs' claims regarding matrix habitat designation fail, they have not demonstrated that Defendants erred by determining that lynx critical habitat will not be adversely affected. Plaintiffs do not show that irreparable harm is likely, and thus their ESA challenge regarding lynx critical habitat does not prevail.

### E.     Grizzly bears

The Forest Service's determination that the Project may affect but is not likely to affect grizzly bears violates the ESA, according to Plaintiffs, because the agency contradicts itself regarding opening of bermed or decommissioned roads and does not specifically determine which roads need more dense cover. Plaintiffs are wrong on both counts.

The Wildlife Biological Assessment states both that "bermed or decommissioned roads would not be opened for thinning" and "bermed, decommissioned, or historic roads will not be opened for thinning without additional, site-specific consultation on the effects to grizzly bears." FS 0773,

38

0785. These statements are not inconsistent. As Defendants explain in the Biological Assessment, no bermed, decommissioned, or historic roads will be opened for the Project. If the Forest Service seeks modification of this policy, additional consultation will be required to ensure protection of the grizzly bear and its habitat. Defendants' position regarding opening roads is not inconsistent and Plaintiffs' arguments fail in this respect.

Plaintiffs' challenge regarding Flathead Forest Plan Amendment 19 likewise fails. Amendment 19 requires that no point within a thinning unit be more than 600 feet from cover for certain areas. The Biological Assessment complies with this mandate as follows: "design criteria include measurers to leave patches of trees unthinned where needed to provide denser cover in the short term. Unthinned areas may be left within thinning units or along open roads to maintain a distance to cover of 600' or less." FS 0785. Plaintiffs desire specifics regarding exactly when and where the thinning will occur, but Defendants are correct that they are not required to demarcate every area on every road where trees will remain. This process can be performed during the thinning process, and Defendants' procedure outlined in the Biological Assessment does not violate the ESA.

## III. Inland Native Fish Strategy

Plaintiffs argue Defendants violate NFMA by failing to comply with

INFISH. Under NFMA, the Forest Service must develop a Land Resource

Management Plan (a forest plan) for each national forest, 16 U.S.C. § 1604(f)(1),

which "provide[s] for diversity of plant and animal communities . . . in order to

meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B). Subsequently,

all projects planned within a forest must be consistent with the forest plan as well

as any regulations in effect at the time of the decision. *Native Ecosystems Council*

*v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005) (citing 16 U.S.C.

1604(l)); *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 n. 9 (9th Cir.

2010) (citation omitted).

The Flathead Forest Plan was amended by INFISH in 1995. INFISH is

designed to protect inland native fish by reducing potential negative impacts to

aquatic habitat in priority watersheds in 22 National Forests. The Flathead River

and its tributaries are designated as a priority watershed under INFISH. INFISH

provides standards for four categories of streams or water bodies including a 300

foot buffer for fish-bearing streams; a 150 foot buffer on each side for all non-fish

bearing streams; and a 100 foot buffer for seasonally flowing or intermittent

streams. FS 0317.

Plaintiffs argue the Forest Service violated INFISH because the Project

shrinks the requisite buffer size without conducting the appropriate watershed

analysis or providing the site-specific data showing the buffers are not needed.

Plaintiffs contend the design criteria is inconsistent because it refers both to the

300 foot INFISH buffer and the 50 foot timber stand improvement buffer.

Defendants contend the application of both buffers is not inconsistent because

they were established for separate purposes.

Defendants appropriately applied INFISH Standard TM-1, which applies to

all Riparian Habitat Conservation Areas, and thus did not violate NFMA.

Standard TM-1 allows thinning when silvicultural methods are applied "in a

manner that does not retard attainment of Riparian Management Objectives and

that avoids adverse effects on inland native fish." FS 0318. This Project was

designed to attain Riparian Management Objectives and its methods avoid adverse

effects on inland native fish. There will be no construction of roads, only hand-

thinning of small trees will occur, and any activities within 50 feet of water require

on-site confirmation from a fisheries biologist that the thinning will have no

measurable effect on bank stability or temperature. The biological assessment

points out that the Project can benefit riparian management objectives by

increasing the size of remaining trees and increasing retention once they fall into

the stream, improving shading, maintaining stream temperatures, and providing

slash filters reducing any overland sediment. FS 8068.[3] Standard TM-1 permits

timber activities that promote riparian management objectives anywhere within the

Riparian Habitat Conservation Area. Thus, the 300 foot buffer does not apply to

all Project activities, and Defendants did not err by applying both the 50 foot and

300 foot buffers to different aspects of the Project.

## CONCLUSION

Defendants' motion for summary judgment will be granted and Plaintiffs'

motion will be denied because the Project does not violate NEPA, the ESA,

NFMA, or the APA as alleged by Plaintiffs.

IT IS ORDERED that Plaintiffs' motion for summary judgment (doc. 18) is

DENIED and Defendants' cross motion for summary judgment (doc. 26) is

GRANTED. The Clerk of Court is directed to (1) enter judgment for Defendants

and against Plaintiffs in accordance with this Order and (2) close this case.

---

[3]Plaintiffs' argument that Defendants rely on post-decisional documents by referencing administrative appeal documents fails because these documents are not post-decisional. Section 706 of the APA, 5 U.S.C. § 706, provides for judicial review of federal administrative actions based upon "the whole record or those parts of it cited by the party." "In general, review should be of 'the full administrative record that was before the [agency decisionmaker] at the time he made his decision.' " *Natural Resources Defense Council v. Norton*, 2007 WL 14283 (E.D.Cal. 2007) *citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Dated this 30th day of October, 2013.


Dana L. Christensen, Chief District Judge
United States District Court